# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 06-CV-4859 (JFB) (ETB)

————————————

ANTHONY CONTE,

Plaintiff,

VERSUS

NEWSDAY, INC. ET AL.,

Defendants.

————————————

**MEMORANDUM AND ORDER**
March 13, 2013

————————————

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Conte ("Conte" or "plaintiff") brings this action against Newsday, Inc. ("Newsday"), Timothy Knight ("Knight"), John Mancini ("Mancini"), Mark Harrington ("Harrington") (collectively, the "Newsday defendants"), Consumers Warehouse Center, Inc. ("Consumers Warehouse"), James S. Baloga, Sr. ("Baloga Sr."), James A. Baloga, Jr. ("Baloga Jr."), Mario Escamilla ("Escamilla") (collectively, the "Consumer defendants"), Alfonso Amorizzo ("Amorizzo"), Laurence Furnell ("Furnell"), Rhoda Zelkind ("R. Zelkind"), Harris Zelkind ("H. Zelkind"), Edmond Chin-Sang ("Chin-Sang"), Pete Dill ("Dill"), Raymond Dodge ("Ray Dodge"), Robert Dodge ("Robert Dodge"), Ken Stone ("Stone"), Rob Rein ("Rein"), Carol Hazeldine ("Hazeldine"), James McMullen ("McMullen"), Gregory Connors

("Connors") (collectively, the "Route distributor defendants"), Giaimo Associates, LLP ("Giaimo Associates"), Joseph O. Giaimo ("Giaimo"), Jade Fuller ("Fuller") (collectively, the "Giaimo Defendants"), Sam Martinez ("Martinez"), Dennis Springer ("Springer"), Ed Smith ("Smith"), and "John and Jane Does, 1-20," unknown individuals and entities, in their individual and official capacities (collectively, "defendants"),[1] alleging violations pursuant to Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

---

[1] As the Court noted in both its September 30, 2008 Memorandum and Order and its March 25, 2010 Memorandum and Order, plaintiff also names other individuals as defendants in this action – John McKeon, Louis Sito, Robert Brennan, Robert Garcia, Dorothy McKillop, John Faiella, and Bob Hoblin. However, because the docket sheet does not indicate that any of these defendants have been served, they are not proper defendants in this case, and are dismissed without prejudice for failure to serve under Rule 4(m) of the Federal Rules of Civil Procedure.

§§ 1962(c) and (d), the Lanham Act, 15 U.S.C. § 1125(a), the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511, the Sherman Act, 15 U.S.C. § 2, and various state law tort claims, all arising from, among other things, Newsday's alleged attempts to monopolize and dominate the print advertising sales and the pre-printed free-standing insert distribution sales markets on Long Island.

By Memorandum and Order dated March 25, 2010, this Court dismissed plaintiff's RICO, Sherman Act, and ECPA claims, as well as plaintiff's slander claim against the Newsday defendants and all of plaintiff's injurious falsehood claims. The Court also granted, in its entirety, defendant Springer's motion to dismiss all of plaintiff's claims against him. The lawsuit proceeded to discovery under the direction of Magistrate Judge Boyle.

Presently before the Court are two motions for summary judgment made, pursuant to Rule 56 of the Federal Rules of Civil Procedure, by the Newsday defendants and the Consumer defendants. For the reasons set forth below, the Court grants the summary judgment motions with respect to plaintiff's remaining federal claims – namely, the Lanham Act claims.

First, the Court grants summary judgment on plaintiff's false advertising claim alleged against Newsday because the uncontroverted evidence shows that plaintiff lacks standing to bring such a claim. It is undisputed that, for a period of time, Newsday inflated its circulation figures in the marketplace. However, it is also uncontroverted that plaintiff did not begin to solicit advertisers for his TV Time publication (the product that was allegedly in competition with Newsday's products) until after Newsday publicly acknowledged

its misstatements and revised its circulation numbers. Accordingly, plaintiff cannot demonstrate a reasonable basis for believing that his potential to attract advertisers to TV Time was damaged by Newsday's false advertising. Moreover, even if plaintiff's false advertising claim is premised on the detraction of advertisers from his TV Week publication (another product that he was allegedly soliciting advertisers for during the period when Newsday's misstated circulation figures were in effect), plaintiff has failed to demonstrate the likelihood of injury and causation necessary to confer standing. Specifically, there is no evidence that plaintiff would have experienced an increase in advertising sales for his product had Newsday not misstated its circulation figures. Moreover, even if there were a reasonable basis for believing that plaintiff suffered a competitive or pecuniary injury, there is no evidence that any such injury was caused by Newsday's misstatements. Instead, plaintiff presents a speculative and attenuated theory of causation that does not satisfy the test for standing. Thus, the uncontroverted evidence demonstrates that, whether plaintiff's false advertising claim is premised on a detraction of advertisers from his TV Time publication or his TV Week magazine, plaintiff lacks standing to bring such a claim under the Lanham Act.

Second, the Court grants summary judgment in the Newsday defendants' favor on plaintiff's deceptive advertising claim because (1) the only evidence of potentially deceptive statements made by Newsday defendants about plaintiff or his business is two Newsday articles (and the Court already held, in a prior Memorandum and Order, that those articles are not commercial advertising, commercial promotion, or commercial speech and, therefore, cannot give rise to a Lanham Act deceptive advertising claim), and (2) even if there

2

were other deceptive statements made by the Newsday defendants about plaintiff or his business outside of the Newsday articles, the uncontroverted evidence shows that such statements would not have been made as part of an organized campaign to penetrate the relevant market and, accordingly, would not be actionable under the Lanham Act.

Finally, with respect to plaintiff's trade dress infringement claim, the Court grants summary judgment in both Newsday's and the Consumer defendants' favor. First, plaintiff's TV Time trade dress is comprised of commonly used, non-unique and functional elements, and there is no evidence that anything about the overall combination of these otherwise unprotectable elements identifies plaintiff as the source of the product. Plaintiff is essentially seeking protection for an idea or concept – a glossy cover of an ad-supported magazine – and the Lanham Act does not protect ideas or concepts. Second, even if plaintiff's trade dress could be considered descriptive, rather than generic, the uncontroverted evidence shows that plaintiff's trade dress has not acquired the secondary meaning required for Lanham Act protection. Third, even assuming *arguendo* that plaintiff's trade dress was protectable, no rational juror could conclude that consumers would likely be confused as to the source of plaintiff's product due to the existence of Newsday's allegedly similar-looking product.

Additionally, given that the federal claims have not survived summary judgment, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims and the Consumer defendants' state law cross-claim.

## I. BACKGROUND

### A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, exhibits, and respective Rule 56.1 Statements of Facts.[2]  Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any evidence in the record to contradict it.[3]

### 1. The Rise and Fall of I Media and TV Time

Conte founded I Media in December of 2003. (Salzman Decl. in Supp. of Newsday Defs.' Mot. for Summ. J. ("Salzman Decl.") Ex. A, Deposition of Anthony Conte ("Conte Dep.") at 120.) I Media published and distributed TV Time Magazine – a

---

[2]  The Newsday defendants submitted a 56.1 Statement with paragraphs numbered 1 through 80. The Consumer defendants filed a 56.1 Statement that adopts and incorporates paragraphs 1 through 15 and 61 through 79 of the Newsday defendants' 56.1 Statement and supplements those statements with additional paragraphs numbered 80 through 139. For purposes of this opinion, the Court reads the two statements together and references a single document (comprised of paragraphs numbered 1 through 139), "Defs.' 56.1 Statement." Similarly, for purposes of this opinion, the Court reads plaintiff's separately filed responses – a response to the Newsday defendants' 56.1 Statement and a response to the Consumer defendants' 56.1 Statement – together and references a single document (responding to defendants' paragraphs numbered 1 through 139), "Pl's. 56.1 Statement."

[3]  Although the parties' Rule 56.1 statements contain specific citations to the record, the Court cites to the Rule 56.1 statements, rather than to the underlying citations.

"free, weekly, full color, gloss-coated, easy to read TV-listings publication containing articles and features related to television as well as crossword puzzles, cartoons and word games." (Salzman Decl. Ex. Z, Apr. 2005 TV Time promotional materials, at 2.) I Media was financed in large part by the sale of delivery routes to independent distributors. (Defs.' 56.1 ¶ 2.) These independent route distributors contracted with I Media to deliver TV Time Magazine to homes across Long Island. (Salzman Decl. Ex. Z, at 2; *see also* Conte Dep. at 148.) Conte claims that I Media raised "a total of about over $1 million for [the TV Time] publication," mainly from the sale of these distribution routes. (Conte Dep. at 148.) According to Conte, the independent distributors who purchased delivery routes were never promised, either orally or in writing, that they would recoup their investment through payments for each delivery of TV Time magazine. (Pl.'s 56.1 ¶ 2.)

TV Time was first published on November 26, 2004. (Defs.' 56.1 ¶ 4.) Defendants claim that, although TV Time was marketed as a weekly publication, it was published only sporadically for a period of less than six months. (*Id.* ¶ 6-7.) Conte claims, however, that TV Time was published weekly for a period of six months, "except for a handful of weeks while he replaced a printer[,] a procedure which normally took several weeks to accomplish." (Pl.'s. 56.1 ¶ 6.) The last issue of TV Time published to date was released on May 1, 2005. (Defs.' 56.1 ¶ 5.) In total, only sixteen issues of TV Time were published. (*Id.* ¶ 8.)

When asked at his deposition whether I Media maintained corporate books, Conte responded, "No, I just maintained the files of the route distributors and various

activities that took place . . . ." (Conte Dep. at 383-84.) Conte also testified that he is uncertain as to whether I Media ever filed a tax return, and further noted that I Media "couldn't even afford to hire an accountant." (*Id.* at 120.) According to defendants, no one paid to advertise in TV Time and Conte did not seriously attempt to sell advertising in TV Time. (Defs.' 56.1 ¶¶ 12-13.) Moreover, in the spring of 2005, some of Conte's route distributors were contacted by investigators from the Nassau County District Attorney's Office who were investigating Conte for fraud. (Salzman Decl. Ex. B, Pl.'s Aff. in Supp. of Mot. for Summ. J., at ¶¶ 85-86.) When asked at his deposition why I Media failed, Conte testified, *inter alia*, that once distributors stopped purchasing routes, potential advertisers decided not to invest, and, ultimately, I Media "failed because it had no more – the cash flow could not keep up with the required cash flow operations of the business." (Conte Dep. at 296-97.)[4] Indeed, Evergreen Printers stopped printing for Conte because he could no longer pay his invoices. (Salzman Decl. Ex. E, Letter dated Sept. 25, 2008 from Ricciuti to Mendelson, at 1-2.)

### 2. The Newsday Circulation Fraud

In the summer of 2004, Conte learned, from a story appearing on the Internet, that Newsday had misstated its circulation numbers for 2002 and 2003. (Defs.' 56.1 ¶ 58; *see also* Salzman Decl. Ex. W, "Newsday, Hoy Reduce Circulation Figures" (June 17, 2004 Newsday press

---

[4] According to plaintiff, the reasons for I Media's failure also include the fact that critical vendors stopped doing business with the Company, that plaintiff spent a great deal of time cultivating a relationship with the Consumer defendants that did not come to fruition, and that alleged "rumors and falsehoods" were spread about plaintiff and his Company. (*See* Conte Dep. at 298-302.)

release publicly announcing that it had misstated its circulation numbers for 2002 and 2003).) Conte spoke with potential clients about paying to advertise in TV Time only *after* the date upon which he learned about Newsday's circulation fraud, sometime in February or March of 2005. (Defs.' 56.1 ¶ 57; *see also* Conte Dep. at 181-82, 218 (testifying that he did not expect to have paying advertisers for TV Time until the magazine had been published consistently for a few months after its initial release in November of 2004, and that he did not even have a rate card or sell sheet to distribute to potential advertisers as of March 2005).) However, Conte claims that he spoke to a long list of potential clients about advertising in TV Week Magazine, a different I Media publication, before the date upon which he learned of the alleged circulation fraud, throughout 2003 and 2004. (Pl.'s 56.1 ¶ 57.)

On September 10, 2004, Tribune Publishing announced revisions to Newsday's circulation figures for 2003 and 2004. (Salzman Decl. Ex DD, "Tribune Updates *Newsday*, *Hoy* Circulation Figures.") On September 13, 2004, Knight sent all Newsday advertisers a letter informing them of Newsday's revised circulation figures. (Salzman Decl. Ex. EE, Letter dated Sept. 13, 2004.) On November 16, 2004, both the Audit Bureau of Circulations ("ABC") and Newsday issued press releases announcing the results of the ABC's audit of Newsday's 2003 and 2004 circulation figures. (*See* Salzman Decl. Ex. FF, "ABC releases Newsday audit for 12 months ending September 2003.") The ABC continued to conduct audits of Newsday every six months, through September 2005. (*See* Salzman Decl. Ex. HH, ABC Bulletin dated Mar. 14, 2005.)

Defendants claim that Conte "used the fact that Newsday had publicly announced that some of its circulation numbers had been misstated to try to recruit advertisers for TV Time." (Defs.' 56.1 ¶ 60.) Indeed, at his deposition, Conte testified that, upon learning of Newsday's misstated circulation numbers, he "tried . . . to capitalize on that misrepresentation." (Conte Dep. at 268; *see also* Salzman Decl. Ex. X, Email exchange between Conte and Baloga Sr., at 2 ("The reality is that Newsday is charging you a fortune for the sloppy product and phantom circulation that they give you.").)

### 3. Newsday's TV Picks

Newsday also had its own television related publication, "TV Picks." Prior to 2004, TV Picks was published as a stand-alone magazine and was distributed inside the Newsday newspaper on Sundays. (Salzman Decl. Ex. JJ, Millrod Decl. ¶¶ 1-2.) In February 2004, Newsday started including TV Picks as pages of the newspaper, but in the spring of 2004, Newsday resumed printing TV Picks as a stand-alone magazine. (*Id.* ¶ 5.) Many features of TV Picks were redesigned throughout the remainder of 2004 and 2005. (*Id.* ¶¶ 6-7.)

As part of the redesign, Newsday decided to use glossy paper stock for the cover. (*Id.* ¶ 8.) Newsday had previously published its television magazine with a glossy cover prior to 2004 (it was called "TV Plus" at that time). (*Id.* ¶ 9.)[5] Other

---

[5] Plaintiff disputes this fact, stating that "Newsday's TV Picks Magazine has not been printed on glossy paper in at least the last 25 years, if ever, and the Newsday defendants make no effort to prove this self-serving statement by producing original copies of such purported glossy cover magazines . . . ." (Pl.'s 56.1 ¶ 69.) However, defendants' contention that Newsday previously published its magazine with

companies, such as the New York Times and the New York Daily News, published TV listings guides on Long Island in 2004 and 2005 with a glossy cover. (Defs.' 56.1 ¶ 68.) The cover of TV Picks used the Scotch Roman and Whitney fonts. (*Id.* ¶ 71.) The cover of TV Picks also contained a banner across the bottom – a banner that was used for paid advertising. (*Id.* ¶ 76.) Defendants claim that this banner was always one color (*id.* ¶ 76), but Conte contends that it was sometimes more than one color (Pl.'s 56.1 ¶ 76). The date of publication was displayed in the center of the cover, next to the Newsday name, and was in the "The Week of X" format. (Defs.' 56.1 ¶ 77.) As part of the redesign, Newsday also reduced the size of its publication from 8" x 10.75" to 8" x 10". (*Id.* ¶ 75.)

### 4. The Consumer Defendants' Interactions with Both Newsday and Conte

Consumers Warehouse is a privately held Long Island company that sells kitchen and bathroom cabinets, kitchen appliances, plumbing fixtures, and other consumer products to the general public and to general contractors. (*Id.* ¶ 81.) During the 2004-2005 time period, Baloga Sr. was the President of Consumers Warehouse, Baloga Jr. was a Vice President, and Escamilla was the Advertising Executive Manager. (*Id.* ¶¶ 82, 84, 86.)

As of 2005, Consumers Warehouse had been advertising in Newsday for over 25 years. (*Id.* ¶ 88.) According to the Consumer defendants, the format of the Newsday publication within which they advertised over the years was dictated solely by

Newsday. (Aff. of Baloga Sr. in Supp. of Consumer Defs.' Mot. for Summ J. ("Baloga Sr. Aff.") ¶ 14.) In 2005, Consumers Warehouse had a contractual relationship with Newsday – they were contractually bound to advertise in Newsday's TV publication for the period from January 1, 2005 through December 31, 2005. (Defs.' 56.1 ¶ 89.)[6] This meant that all of Newsday's subscribers and purchasers across Long Island would receive Consumers Warehouse's advertisements throughout 2005. (Baloga Sr. Aff. ¶¶ 21, 23.)

The Consumer defendants claim that they first learned of the new format of Newsday's TV Picks in December of 2004 (that was to go into effect for the February 6, 2005 edition of the publication). (Defs.' 56.1 ¶ 90.) One of the notable changes in format that the Consumer defendants learned about was that the footer at the bottom of the cover page would become advertising space. (*Id.* ¶ 91.)[7] The February 6, 2005 edition of

---

[6] Although plaintiff does not dispute that this contractual relationship between Consumers Warehouse and Newsday existed in 2005, he claims that he only learned about it sometime in 2011 as a result of discovery. (Pl.'s 56.1 ¶ 89.)

[7] Plaintiff claims that "the new Consumer's advertising footer was copied from the plaintiff's TV Time Magazine." (Pl.'s 56.1 ¶ 91.) However, plaintiff cites no evidence to support this conclusory assertion. Plaintiff merely references the ad that the Consumer defendants submitted to Newsday on January 25, 2005 – an ad that they submitted as a "banner to run on front cover of TV Picks." (*See* Pl.'s Aff. in Opp'n to Consumer Defs.' Mot. for Summ. J. ("Pl.'s Consumer Opp'n") Ex. L, AdTransit.com Transmission Confirmation dated Jan. 25, 2005.) Plaintiff appears to claim that, because the ad was submitted as a banner for the front cover of TV Picks in January of 2005, the conversation wherein the Consumer defendants first learned about Newsday's decision to include banner advertisements on the front cover of their publication must have occurred during that same week in January, and not back in

---

a glossy cover is contained in the sworn declaration of Newsday's Executive News Editor and plaintiff cites no evidence to support his contrary position. The Court, therefore, deems this fact uncontroverted.

Newsday's TV Picks featured such an advertising banner for Consumers Warehouse. (*Id.* ¶ 94.) The Consumer defendants assert that the format of TV Picks that went into effect on February 6, 2005 was not changed at their request. (*Id.* ¶ 98.)[8]

The Consumer defendants first contacted Conte on January 25, 2005. (Pl.'s 56.1 ¶ 101.)[9] This occurred after Baloga Sr. found a copy of TV Time in his driveway and wanted to find out Conte's rate card for advertising. (Baloga Sr. Aff. ¶ 19.) Baloga Sr. states that he viewed TV Time as a potential way to reach other Long Island residents who did not subscribe to or purchase Newsday, as TV Time was being distributed as a free publication to the public. (*Id.* ¶¶ 21, 23.)

Following their initial conversation, Escamilla emailed Conte (on January 25, 2005) asking for "a rate card for full page, inside and back cover and total circulation for Suffolk and Nassau. Including selected zip codes throughout Long Island." (Consumer Defs.' Mot. for Summ. J. Ex. D, Jan. 25, 2005 email.) Conte emailed Escamilla on January 30, 2005, but did not include the rate card requested. (Defs.' 56.1 ¶¶ 105-06.) Instead, he asked for time to prepare a proposal and offered, "as a courtesy[,] . . . to place a full page, full color ad on the rear cover full gloss of the next edition of our magazine which goes to press Thursday afternoon." (Consumer Defs.' Mot. for Summ. J. Ex. C, Baloga Sr. Dep., at 47 (reading from a Jan. 30, 2005 email from plaintiff to Escamilla).) On February 21, 2005, Conte offered to run another

---

December of 2004. (*See* Pl.'s 561. ¶ 91.) It is entirely plausible that the Consumer defendants learned about the banner advertisements in one month, and then submitted their proposed banner advertisement a whole month later. In fact, Baloga Sr. stated that this is precisely what occurred (that upon learning of the banner change in late December, the Consumer defendants used January to prepare new artwork, which they eventually submitted to Newsday on January 25, 2005). (*See* Baloga Sr. Aff. ¶ 18.) Therefore, no rational juror could conclude that, simply because the Consumer defendants' first banner advertisement was submitted to Newsday on January 25, 2005, the Consumer defendants must have first learned about Newsday's use of such banner advertisements that same week.

[8] Plaintiff claims that "the format of TV Picks that went into effect on February 6, 2005 was a direct result of demands made by the Consumer defendants that they copy the look and trade dress of the plaintiff's TV Time Magazine that first appeared in the Consumer defendant James Baloga, Sr.'s, driveway in Early January of 2005." (Pl.'s 56.1 ¶ 98.) Again, plaintiff's conclusory assertion is not supported by any evidence in the record. Plaintiff merely points to the ad that the Consumer defendants submitted to Newsday on January 25, 2005 as evidence that the Consumer defendants "not only requested the change but literally designed, had prepared and submitted for insertion in TV Picks January 25, 2005 the advertising footer banner component that they plagiarized and copied from the plaintiff's TV Time Magazine . . . ." (*Id.*) A mere ad submission by the Consumer defendants is not evidence of plagiarism of the advertising concept or style that the ad espouses on the part of the Consumer defendants, nor is it evidence of the Consumer defendants instituting a universal format change of another company's publication. Thus, no rational juror could conclude, based on the evidence presented, that the Consumer defendants orchestrated Newsday's format change.

[9] Plaintiff contends that the change in Newsday's TV Picks format did not occur before this date upon which the Consumer defendants first contacted plaintiff, but that "the changes to Newsday's TV Picks . . . took place *at the time* the Consumer defendants had contacted the plaintiff." (Pl.'s 56.1 ¶ 102 (emphasis added).) To support his assertion, plaintiff poses a question: "Again, if the Consumers defendants were aware of the changes in Newsday's TV Picks prior to January 25, 2005, why would they be calling the plaintiff to discuss advertising in his publication?" (*Id.*) However, a hypothetical question is not evidence to support an otherwise conclusory statement.

complementary advertisement for Consumers Warehouse in the March 6, 2005 edition of TV Time. (Defs.' 56.1 ¶ 113.) Then, on March 17, 2005, Conte again offered, as a courtesy, to rerun the original Consumers Warehouse ad in TV Time's next edition. (*Id.* ¶ 116.)[10] Advertisements for Consumers Warehouse appeared at least four times in TV Time. (*Id.* ¶ 135.) It is undisputed that Conte never sent an invoice to the Consumer defendants for this advertising (*id.* ¶ 136), although he maintains that he has "repeatedly asked" for payment for the advertisements (Pl.'s 56.1 ¶ 136). Consumers Warehouse advertisements ran in Newsday's TV Picks on all dates that an advertisement for the Company appeared in TV Time. (Defs.' 56.1 ¶ 137.)

The Consumer defendants claim that, on or about March 25, 2005, they informed Conte that they were not interested in advertising in TV Time. (*Id.* ¶ 122.) Conte contends, however, that he was never informed – through email or otherwise – of the Consumer defendants' discontinued interest in advertising in TV Time. (Pl.'s 56.1 ¶ 122.) It is undisputed, however, that Conte never received any written commitment from the Consumer defendants to advertise in his publication. (Defs.' 56.1 ¶ 117; *see also* Consumer Defs.' Mot. for Summ. J. Ex. I, Mar. 25, 2005 email from Conte to Escamilla (explaining that he was

willing to engage in all reasonable efforts to get the Consumer defendants to commit to a long term contract).)

In April 2005, Baloga Sr. met with Conte and made an offer to advertise in TV Time for 26 weeks for $50,000.00. (Defs.' 56.1 ¶ 126.) Ms. Gallardo, a woman who worked for Conte at the time, testified that Consumers Warehouse was the only Company willing to pay Conte for advertising at the time, and that she tried to convince Conte to agree to their number, to no avail. (*See* Consumer Defs.' Mot. for Summ. J. Ex. Q, Deposition of Monica Gallardo ("Gallardo Dep.") at 33, 55-56.) In response to Baloga Sr.'s offer, Conte sent an email stating that he has other companies who are interested in advertising for a higher price, and that he would sign a contract with one of the other companies if he did not receive a new offer from Consumers Warehouse. (*Id.* ¶ 127.) He also told Baloga Sr. that he would offer him "the first opportunity to lock in the rear cover for the next 52 weeks at the $25 CPM rate the other retailers are willing to pay," and explained that he needed an answer by that Wednesday and a signed contract by that Friday, otherwise he would "immediately sign a contract with one of the other retailers." (Consumer Defs.' Mot. for Summ. J. Ex. L, Apr. 11, 2005 email from plaintiff to Baloga Sr.) Baloga Sr. responded the next day, telling Conte that he was "happy to hear [Conte's] publication has met with much success" and that he "continue[s] to wish great fortune in the coming months with [Conte's] proposed growth and if [he] ever can be of any assistance," Conte should not hesitate to call him. (*Id.*)

---

[10] Although plaintiff claims that these courtesies were extended only because the Consumer defendants repeatedly expressed an intention to enter into a long term advertising agreement with I Media to advertise in TV Time, plaintiff cites no evidence to support his theory. (*See* Pl.'s 56.1 ¶¶ 113-14.) Thus, no rational juror could conclude that any verbal promise was made to that effect. In any event, as discussed *infra*, even if this allegation were true, the Lanham Act claim would not survive summary judgment because the trade dress is not protectable.

8

5. The Route Distributors' Dissatisfaction with Conte and Newsday's Alleged Involvement

Harrington claims that he was approached by some of Conte's route distributors who were dissatisfied with Conte in May or June of 2005. (Defs.' 56.1 ¶ 29.) Harrington claims that he then, in about late May or June of 2005, began researching and writing a story about Conte. (*Id.* ¶ 30.) Mancini, the editor of Newsday at the time, states that he did not authorize or instruct Harrington to write a piece about Conte (Salzman Decl. Ex. Q, Mancini Decl., ¶ 4), and that he was not involved in the day-to-day news gathering activities of the Newsday reporters (*id.* ¶ 2). Knight, the president, publisher, and CEO of Newsday at the time, similarly states that he did not authorize or instruct Harrington to conduct an investigation of Conte (Salzman Decl. Ex. R, Knight Decl., ¶ 4) and that he did not become familiar with what stories reporters were covering until they were printed and published (*id.* ¶ 2).

In June 2005, Harrington called Ram Marketing, one of Conte's vendors. (Defs.' 56.1 ¶ 44.) According to defendants, Harrington called Ram Marketing to verify their relationship with Conte. (*Id.*) Matthew Moon, the president of Ram Marketing, stated that "[a]lthough [he has] no memory of a conversation with anyone from Newsday, such a conversation would not have had any effect on [his] business relationship with Mr. Conte." (Salzman Decl. Ex. S, Moon Decl., ¶ 5.) In July 2005, Harrington attended a meeting of Conte's route distributors and their attorney, Giaimo. (Defs.' 56.1 ¶ 40.) According to defendants, Harrington's sole purpose in attending this meeting was to gather information about Conte and his business. (*Id.* ¶ 41.) At around the same time, Harrington also called Conte. (*Id.* ¶ 42.) Defendants claim that, in calling plaintiff, Harrington was attempting to get Conte's side of the story for his articles (*id.*), while Conte claims that Harrington was simply trying to further an alleged extortion attempt (Pl.'s 56.1 ¶ 42).

On August 2, 2005, thirty-three of plaintiff's route distributors filed a class action in Nassau County, *Amorizzo et al. v. Conte et al.*, alleging that I Media was a scheme perpetrated by Conte to defraud them of the money they paid for their delivery routes. (Defs.' 56.1 ¶ 17.) Giaimo was the attorney the route distributors retained to investigate their case and draft a complaint ("*Amorizzo* Complaint") on their behalf. (Salzman Decl. Ex. J, Declaration of Giaimo ("Giaimo Decl.") ¶ 7.) Giaimo drafted the *Amorizzo* Complaint without the assistance of any of the Newsday defendants.[11]

---

[11] Although plaintiff claims that Giaimo drafted the complaint with the assistance of Newsday employees (Pl.'s 56.1 ¶ 21), the evidence he cites does not support his contention. For example, plaintiff cites to a voicemail Furnell left plaintiff indicating that he spoke to Harrington about Harrington's plans to publish an article about plaintiff and I Media back in June of 2005, before the *Amorizzo* complaint was filed (Pl.'s Opp'n Aff. to Newsday Defs.' Mot. for Summ. J. ("Pl.'s Newsday Opp'n") Ex. X, Harrington Dep. at 223-25), and to a short article Harrington and Newsday published in Newsday's Beatnotes column online about plaintiff and TV Time in July 2005, before the *Amorizzo* Complaint was filed (Pl.'s Newsday Opp'n Aff. Ex. EE, Harrington Beatnotes), to show that Harrington was involved in matters relating to plaintiff before the *Amorizzo* Complaint was filed and, therefore, that he was also involved in drafting the *Amorizzo* Complaint. However, this link is obviously attenuated; the evidence does not even remotely prove that Harrington personally assisted Giaimo in writing the *Amorizzo* Complaint. Quite to the contrary, Giaimo explicitly states, "Absolutely no one assisted me in drafting and finalizing the complaint. . . . Neither Harrington nor anyone else from Newsday or

Harrington received a copy of the *Amorizzo* Complaint. Defendants claim that he first received the *Amorizzo* Complaint "on or about the time that it was filed in court" (Defs.' 56.1 ¶ 18), but Conte contends that Harrington received it "before it was filed and certainly before it was served on the plaintiff" (Pl.'s 56.1 ¶ 18). On September 7, 2005, Harrington published an article in Newsday entitled "Distributors sue over TV Time." (Defs.' 56.1 ¶ 19.) He published another article in Newsday entitled, "DA opens criminal probe into i-Media" on September 14, 2005. (*Id.*)[12] The Newsday Articles both quoted the *Amorizzo* Complaint. (*Id.* ¶ 20.)

In February 2006, Conte filed an answer in the *Amorizzo* lawsuit, which included five counterclaims against the route distributors and sought over $410 million in damages. (Salzman Decl. Ex. O, Answer to First Am. Verified Class Action Compl. with Countercls.) On June 26, 2006, the Supreme Court, Nassau County, dismissed three of Conte's counterclaims and his claim for punitive damages. (Salzman Decl. Ex. P, Order dated June 26, 2006.) On August 30, 2006, Conte filed an eleven-count, $8.3 billion lawsuit against Nassau County, the Nassau District Attorney, and various Assistant District Attorneys and investigators with this Court. (*See Conte v. County of Nassau et al.*, No. 06 Civ. 4746.)

## B. Procedural History

Plaintiff filed the initial complaint in this action on September 7, 2006. Plaintiff subsequently filed two amended complaints and an amended RICO statement. By Memorandum and Order dated September 30, 2008, the Court denied in part and granted in part defendants' motions to dismiss the second amended complaint. Specifically, the Court denied defendants' motions to dismiss plaintiff's federal Lanham Act and state tortious interference claims. The Court granted defendants' motions in all other respects, but provided plaintiff with an opportunity to re-plead the dismissed claims.

Plaintiff filed a third amended complaint on April 2, 2009, re-asserting all of the dismissed claims, as well as a fraud claim against the Consumer defendants. The Newsday defendants, Giaimo defendants and Route distributor defendants, and Consumer defendants all filed motions to dismiss on June 19, 2009. Plaintiff filed oppositions to defendants' motions on September 23, 2009. The Newsday defendants and Consumer defendants filed replies on September 25, 2009, and the Giaimo and Route distributor defendants filed a reply on October 7, 2009. By letter dated October 1, 2009, *pro se* defendant Springer also moved to dismiss plaintiff's claims against him. By Memorandum and Order dated March 25, 2010, the Court granted defendants' motions to dismiss plaintiff's RICO, Sherman Act, and ECPA claims, as well as plaintiff's slander claim

---

anywhere else helped me draft the complaint." (Giaimo Decl. ¶ 8.) Moreover, to support his claim that Mancini and Knight were also involved in drafting the *Amorizzo* Complaint, plaintiff simply states, in a conclusory fashion, that Mancini and Knight were both "in the loop of Newsday management receiving e-mails about the plaintiff and the defamatory article being written about him and I Media as early as August 18, 2005 if not sooner." (Pl.'s 56.1 ¶¶ 24, 26. *But see* Mancini Decl. ¶ 10 ("I did not participate in drafting that complaint that was filed in *Amorizzo* . . . .").) Because plaintiff has not offered any evidence in support of his conclusory allegations, the Court deems the Newsday defendants' lack of involvement in the drafting of the complaint to be uncontroverted.

[12] The Court will refer to these two articles published by Harrington in September 2005 as "the Newsday Articles."

against the Newsday defendants, all of plaintiff's injurious falsehood claims, and all claims against Springer. The Court denied defendants' motions in all other respects.

On May 5, 2010, the Consumer defendants filed an answer to plaintiff's third amended complaint, as well as a cross-claim against the other named defendants for indemnity and/or contribution. The Giaimo defendants and the Route distributor defendants filed a verified answer on July 14, 2010. On July 28, 2010, three separate answers to plaintiff's third amended complaint were filed – one by Harrington, one by Mancini, and one by Knight and Newsday. The lawsuit proceeded to discovery under the direction of Magistrate Judge Boyle.

By later dated October 24, 2011, plaintiff submitted to the Court copies of a settlement agreement he entered into with Giaimo, on behalf of the Giaimo defendants and the Route distributor defendants, on October 18, 2011. On October 28, 2011, the Court signed a Stipulation and Order of Settlement between plaintiff and the Giaimo and Route distributor defendants.

On March 16, 2012, the Newsday defendants filed a motion for summary judgment. On March 23, 2012, the Consumer defendants also filed a motion for summary judgment. On August 20, 2012, plaintiff filed a separate opposition to each motion for summary judgment. On August 30, 2012, both the Newsday defendants and the Consumer defendants filed replies in further support of their motions for summary judgment. By letter dated September 10, 2012, the Newsday defendants requested that the Court disregard new arguments concerning the Newsday defendants that plaintiff raised in his opposition to the Consumer defendants' motion for summary

judgment, or that the Court, in the alternative, grant the Newsday defendants leave to file a five-page reply. By Order dated September 14, 2012, the Court granted the Newsday defendants leave to file a five-page reply, which they filed on October 5, 2012. Oral argument was held on November 30, 2012. Plaintiff submitted a letter to the Court on January 3, 2013. The Consumer defendants responded to plaintiff's letter by letter dated January 4, 2013. The Newsday defendants similarly responded, by letter dated January 7, 2013. Plaintiff responded to both letters by submitting two separate letters to the court on January 8, 2013. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the

evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting

*Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

#### A. Plaintiff's Lanham Act Claims

Plaintiff asserts that both the Newsday defendants and the Consumer defendants violated various provisions of the Lanham Act. Specifically, plaintiff brings Lanham Act claims against Newsday for false advertising and trade dress infringement and against all of the Newsday defendants for deceptive advertising. Plaintiff also claims that the Consumer defendants infringed plaintiff's trade dress in violation of the Lanham Act. For the reasons set forth below, both the Newsday defendants and the Consumer defendants are entitled to summary judgment on plaintiff's Lanham Act claims.

##### 1. Plaintiff's Lanham Act False Advertising Claim

Plaintiff alleges that Newsday's inflated circulation figures violated Section 43(a) of the Lanham Act. Specifically, plaintiff alleges that from 2003 to 2005, Newsday "advertised, published, disseminated and communicated knowingly false and misleading material statements of fact and unfounded misrepresentations about the circulation of their daily newspapers fraudulently inflating the advertised . . . circulation figures by between 10-20 percent or more." (Third Am. Compl. ¶ 117.) Plaintiff claims that, as a result of these alleged misrepresentations, advertisers were induced to purchase advertising space from Newsday, rather than from plaintiff, thereby causing I Media to "suffer[] a direct loss of print advertising and insert distribution service sales." (*Id.* ¶¶ 118, 120.) For the reasons set forth below, the uncontroverted

evidence in the record demonstrates that plaintiff lacks standing to sue the Newsday defendants for false advertising under Section 43(a) of the Lanham Act. Accordingly, the Court grants summary judgment in favor of Newsday on plaintiff's Lanham Act false advertising claim.

### a.   Applicable Law

Section 43(a) of the Lanham Act prohibits false representations in advertising concerning the qualities of goods and services. *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196-97 (2d Cir. 2001); 15 U.S.C. § 1125(a)(1)(B). To establish a false advertising claim under Section 43(a), "a plaintiff must prove the following elements: 1) the defendant has made a false or misleading statement; 2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; 3) the deception is material in that it is likely to influence purchasing decisions; 4) there is a likelihood of injury to plaintiff, such as declining sales or loss of goodwill; and 5) the goods traveled in interstate commerce." *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 177-78 (S.D.N.Y. 2004). A Lanham Act false advertising claim may be based on one of two theories: "that the challenged advertisement is literally false, *i.e.*, false on its face," or "that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007).

The Second Circuit generally uses a "reasonable interest" test to determine whether a plaintiff has standing to bring a Lanham Act false advertising claim. *See Famous Horse, Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 113 (2d Cir. 2010). "Under

this rubric, in order to establish standing under the Lanham Act, a plaintiff must demonstrate (1) a reasonable interest to be protected against the alleged false advertising and (2) a reasonable basis for believing that the interest is likely to be damaged by the alleged false advertising." *Id.* (citing *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994)).[13] The "reasonable interest" prong includes "commercial interests, direct pecuniary interests, and even future potential for a commercial or competitive injury." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 169 (2d Cir. 2007). The "reasonable basis" prong "requires the plaintiff to show both likely injury and a causal nexus to the false advertising." *Id.* at 170 (citation and internal quotation marks omitted).

"[W]hile a plaintiff must show more than a 'subjective belief' that it will be damaged, it need not demonstrate that it is in direct competition with the defendant or that it has definitely lost sales because of the defendant's advertisements." *Ortho Pharm. Corp.*, 32 F.3d at 694. However, "[t]he likelihood of injury and causation will not be presumed, but must be demonstrated in some manner." *Id.* Moreover, a plaintiff must make "a 'more substantial showing' of injury and causation 'where the plaintiff's products are not obviously in competition with defendant's products.'" *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir.

---

[13] The Court notes that the Second Circuit has applied a stronger categorical test for standing on at least one occasion – that "[t]o have standing for a Lanham Act false advertising claim, the plaintiff must be a competitor of the defendant and allege a competitive injury." *Telecom Int'l Am., Inc.*, 280 F.3d at 197 (alteration, citation, and quotation marks omitted). Because, for the reasons discussed *supra*, plaintiff fails to satisfy the more lenient "reasonable interest" test for standing, the Court need not address the more stringent *Telecom* test.

1997) ("*PDK Labs II*") (quoting *Ortho Pharm. Corp.*, 32 F.3d at 694).

b. Analysis

At the motion to dismiss stage of this case, Newsday moved to dismiss Contes's false advertising claim for the same reason that it now moves for summary judgment on that claim – that Conte lacks standing. Although the Court denied Newsday's motion to dismiss on this theory, given the uncontroverted evidence now in the record indicating that Conte in fact lacks standing to bring a Lanham Act false advertising claim, the Court grants summary judgment in Newsday's favor. *See, e.g.*, *PDK Labs, Inc. v. Friedlander*, No. 93 Civ. 7787 (RPP), 1995 U.S. Dist. LEXIS 10831 (S.D.N.Y. Aug. 3, 1995) ("*PDK Labs I*") (granting summary judgment, after denying defendant's motion to dismiss, for lack of standing under the Lanham Act because plaintiff failed to show that defendant's alleged false advertising about its dietary supplements was likely to cause injury to plaintiff's sales of his potential weight control product, for which he had yet to even seek FDA approval), *aff'd*, 103 F.3d 1105 (2d Cir. 1997).

As a preliminary matter, the Court notes that the fact that a false or misleading statement was made is undisputed. Newsday does not dispute that its circulation numbers for 2002 and 2003 were misstated. Newsday also does not dispute that those misleading, inflated circulation numbers were operating in the marketplace, unbeknownst to the public, until June 17, 2004, when Newsday publically reported that its circulation figures had been inflated (*see* Salzman Decl. Ex. W), and that the misleading, inflated circulation numbers were not fully corrected until September of 2004 (*see* Salzman Decl. Ex. DD (publically announcing revisions to

Newsday's circulation figures for 2003 and 2004 on September 10, 2004); *id.* Ex. EE (informing Newsday advertisers, on September 13, 2004, of revised circulation figures)). The issue on summary judgment is, therefore, whether Conte has standing to bring a Lanham Act false advertising claim against Newsday based on these inflated circulation figures. For the following reasons, it is clear that Conte does not.

i. Standing based on TV Time

The uncontroverted evidence shows that I Media's TV Time and Newsday's TV Picks were not in competition during the period when Newsday's inflated circulation figures were operative in the marketplace – that is, prior to June 17, 2004, when Newsday reported to the public that its circulation figures had been inflated – because Conte had not yet released TV Time to the public (*see* Defs.' 56.1 ¶ 4 (first issue of TV Time was circulated on November 26, 2004)). *See PDK Labs II*, 103 F.3d at 1112 ("Freidlander and PDK are not competitors for purposes of Lanham Act standing because Friedlander does not currently sell a retail weight loss product that competes with PDK's products."). Because Conte's TV Time product was "not obviously in competition with defendant's products" during the period when Newsday was misstating its circulation numbers, Conte must make "a more substantial showing of injury and causation" to prove that he has standing to bring a Lanham Act false advertising claim. *Id.* at 1111 (quoting *Ortho Pharm. Corp.*, 32 F.3d at 694) (internal quotation marks omitted); *see also ITC Ltd.*, 482 F.3d at 170 ("Where a plaintiff's products are not obviously in competition with the defendant's products, and the defendant's advertisements do not draw direct comparisons between the products, then a plaintiff must make a more

14

substantial showing of injury and causation to satisfy the reasonable basis prong of the standing requirement." (citation and internal quotation marks omitted)).

Conte's stated injury relates to his advertising efforts – he claims that he engaged in substantial advertising sales efforts during the period when Newsday's misstated circulation figures were in effect, that he was a direct advertising competitor of Newsday during that time, and that Newsday's inflated numbers allowed it to set higher advertising rates and offer advertisers substantially reduced discounted rates, putting other competitors, such as I Media, at a disadvantage. (Pl.'s Newsday Opp'n ¶¶ 41-42.) In essence, Conte claims that Newsday's misstatements allowed it to attract potential advertisers away from I Media. However, "although a future potential for a commercial or competitive injury can establish standing," *PDK Labs II*, 103 F.3d at 1112 (citation and internal quotation marks omitted), the uncontroverted evidence shows that Newsday's circulation-related misstatements were made *before* Conte started to actively solicit advertisers for TV Time (*see* Defs.' 56.1 ¶ 57; *see also* Conte Dep. at 181-82, 218), and Conte cannot show that Newsday continued to misstate its circulation figures thereafter.[14] Accordingly, there is no evidence that Newsday's circulation-related misstatements caused Conte a competitive or commercial injury with respect to TV Time.

### ii.  Standing based on TV Week

In his opposition papers, Conte contends that he was in fact soliciting advertisers during the period when Newsday's misstated circulation figures were in effect, not for I Media's TV Time publication, but for I Media's TV Week publication. (Pl.'s Newsday Opp'n ¶ 41 (citing to, *inter alia*, rate cards, letters to potential advertisers, and billing statements for advertisements from this time period); *see also* Pl.'s 56.1 ¶ 57 (explaining that he spoke to a long list of potential advertisers about advertising in TV Week throughout 2003 and 2004).) Conte, therefore, claims that because he was a "direct advertising sales competitor of Newsday from March of 2003 to June 17, 2004" (*see* Pl.'s Newsday Opp'n ¶ 13), the period during which Newsday's misstated circulation numbers were in effect, he has standing to bring a Lanham Act false advertising claim. However, even if Conte's advertising activities related to TV Week made him a direct competitor of Newsday while its misstated circulation figures were in effect, his argument fails because there is no evidence of "the likelihood of injury and causation" that a plaintiff is required to demonstrate in order to satisfy the Lanham Act's standing requirements.

"While a plaintiff need not demonstrate that it has, in fact, 'lost sales because of the defendant's advertisements,' to establish standing, it must demonstrate 'the likelihood of injury and causation . . . in some manner.'" *ITC Ltd.*, 482 F.3d at 171 (quoting *Ortho Pharm. Corp.*, 32 F.3d at 694); *see also PDK Labs II*, 103 F.3d at 1112 ("A plaintiff must submit specific evidence that the defendant's advertising causes direct harm to the product in which the plaintiff claims a pecuniary interest."). Conte has failed to establish a reasonable basis for competitive injury, as he has

---

[14] Quite to the contrary, the uncontroverted evidence shows that once plaintiff learned about Newsday's misstated circulation numbers, he attempted to use that fact to his advantage. (*See* Conte Dep. at 268 (explaining that, in regards to Newsday's misstated circulation numbers, he "tried . . . to capitalize on that misrepresentation").)

provided no evidence that I Media would have experienced an increase in advertising sales for its TV Week publication had Newsday not misstated its circulation figures. *See Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 546 (E.D.N.Y. 2010) (finding that "[a]bsent any affidavit or evidence beyond [plaintiff's] assertions," there is no indication that retail clients purchased from defendant and, had they been aware of the truth, would have increased their purchases from plaintiff); *see also PDK Labs II*, 103 F.3d at 1113 ("Friedlander submitted no specific evidence that PDK's products harm his efforts to solicit investments and collect royalties under his patent. Friedlander's evidence of alleged lost investors is scanty at best."); *Ortho Pharm. Corp.*, 32 F.3d at 697 (affirming district court's dismissal of Lanham Act claim for lack of standing when plaintiff failed to show that, as a result of defendant's conduct, plaintiff will lose customers "[b]ecause consumer behavior is unpredictable, and because of the general rule in our Circuit against making presumptions of injury and causation favorable to the plaintiff"); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980) ("[S]omething more than a plaintiff's mere subjective belief that he is injured or likely to be damaged is required before he will be entitled even to injunctive relief."). Conte has also failed to establish a reasonable basis for causation, as his reasoning "depends on multiple levels of speculation" – that (1) the inflated numbers allowed Newsday to set and publish substantially higher advertising rates; (2) that those higher advertising rates allowed Newsday to offer advertising customers discounted rates in return for signing long term advertising agreements; (3) that Newsday in fact offered long-term exclusive agreements to advertisers; and (4)

that advertisers signed those agreements, thereby preventing them from advertising with I Media – "and its conclusion is too attenuated . . . to demonstrate a real 'likelihood of injury and causation' sufficient to confer standing to sue for false advertising." *See ITC Ltd.*, 482 F.3d at 171. For these reasons, Conte has no standing to bring a false advertising claim even if his claim is premised on the alleged detraction of potential advertisers from TV Week.

In sum, the uncontroverted evidence shows that Conte does not have standing to bring a Lanham Act false advertising claim against Newsday based either on TV Time or TV Week.[15] Accordingly, summary judgment on this claim is granted in Newsday's favor.

### 2. Plaintiff's Lanham Act Deceptive Advertising Claim

Conte also brings a Lanham Act claim against the Newsday defendants for deceptive advertising. He alleges that the Newsday defendants and the Route distributor defendants "repeatedly disseminat[ed] and communicat[ed] verbally by telephone and in face to face conversations false material statements pertaining to the plaintiff's business I Media . . . includ[ing] false, disparaging and misleading statements and unfounded misrepresentations about the business, good will, and reputation of I Media and the products and publications distributed by it." (Third Am. Compl. ¶ 135.) According to Conte, these allegedly false statements "had a tendency to deceive and actually deceived a substantial number of I Media's and TV Time's actual and potential route distributors, vendors, advertisers and readers

---

[15] Because plaintiff lacks standing, the Court need not address the merits of his false advertising claim.

. . . influenc[ing] [their] investments and purchasing decisions." (*Id.* ¶ 136.) The Newsday defendants move for summary judgment on this claim, contending that (1) the only allegedly false statements made by Newsday defendants about Conte or his business were contained within the Newsday articles that the Court already held cannot give rise to a Lanham Act deceptive advertising claim, and (2) there is no other evidence in the record tending to show that any of the Newsday defendants misrepresented Conte's goods as part of a commercial campaign, as is required under the Lanham Act. For the following reasons, the Court agrees with the Newsday defendants and, thus, grants summary judgment on this claim in their favor.

Section 43(a) of the Lanham Act provides:

> any person who . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a). Critical to this section is the fact that the misrepresentation must occur in "commercial advertising or promotion" to be actionable. As the Second Circuit has explained, "the touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). Accordingly, "[p]roof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement." *Id.* (explaining that "businesses harmed by isolated disparaging statements do not have redress under the Lanham Act"). In evaluating whether a party's statements were "part of an organized campaign to penetrate the relevant market," the Second Circuit has considered the following factors: (1) the number of alleged statements; (2) to whom the statements were made; (3) where the statements were made; and (4) the size of the relevant market. *Id.* at 58.

As a preliminary matter, the Court reiterates that, as previously stated in its September 30, 2008 Memorandum and Order, Harrington's Newsday articles cannot give rise to a Lanham Act deceptive advertising claim. *See Gmurzynska v. Hutton*, 355 F.3d 206, 210-11 (2d Cir. 2004) (holding that articles published by a journalist are "not commercial advertising, commercial promotion, or commercial speech. Rather, it is speech that is traditionally granted full protection under the First Amendment"); *cf. Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1533 (S.D.N.Y. 1994) ("Congress, in extending the Lanham Act to product disparagement, made clear that this extension should not be interpreted so as to infringe on free speech protected by the First Amendment."). Thus, to the extent Conte's deceptive advertising claim against the Newsday defendants is premised on allegedly false statements made in the Newsday articles, his claim fails.

Accordingly, to survive summary judgment, Conte must produce sufficient evidence for a reasonable jury to conclude that the Newsday defendants made other allegedly false statements (outside of the published Newsday articles) as part of an

organized campaign to penetrate the market. Applying the factors used by the Second Circuit to determine whether a party's statements were part of an organized campaign to penetrate the relevant market, it is clear that Conte has failed to do so.

First, Conte has failed to even identify any concrete, allegedly deceptive statements made by the Newsday defendants about his product or his commercial activities (other than those contained in the published articles which, as discussed above, cannot give rise to liability under the Lanham Act). In his opposition papers, Conte claims that Newsday is liable for false criminal accusations that were made by some of his route distributors about him and his Company because those route distributors were Newsday employee/agents. (Pl.'s Newsday Opp'n ¶ 33.) In essence, Conte claims that some of his route distributors were Newsday employee/agents, that those route distributors made false criminal accusations about Conte and his Company, and that Newsday is "liable as principal for the falsities disseminated by [those] agents." (*Id.*) Putting aside the issue of whether Newsday can be held liable for the statements made by Conte's route distributors under Conte's agency theory of liability, Conte's allegation that the route distributors disseminated falsities about him is simply conclusory and unsupported by any evidence in the record.

Conte's argument is premised on an email Harrington wrote to one of his editors. The email contains the following:

Got a call from a Newsday agent. He and around 25 other agents are in contact with the Nassau DA's office after the owner of a TV guide-type magazine they began distributing (not Newsday), from a Mellville company called Imedia, has stopped providing them with paper and the owner apparently has fled . . . They believe the operation is a Ponzi scheme. . . . Agents have planned a meeting for next week to discuss what steps to take, but many worry their investments are lost.

(Pl.'s Newsday Opp'n Ex. W, June 14, 2005 email.) Conte claims, based solely on this email, that "[c]learly a number of Newsday employee/agents were making false and deceptive criminal accusations concerning I Media and the plaintiff Anthony Conte as early as June of 2005 . . . ." (Pl.'s Newsday Opp'n ¶ 33.) However, quite to the contrary, it is far from clear, at least from this email alone, that the route distributors disseminated any deceptive statements about Conte or his business actionable under the Lanham Act. This email merely shows, if anything, that "agents" were meeting with the Nassau DA's office, but does not indicate what, if any, false accusations about Conte or his business were made. Moreover, even if the "agents" conveyed their belief that Conte's operation was a "Ponzi scheme" to the DA's office, "[s]ubjective claims or opinions are not actionable [under Section 43(a)] because they are not statements of fact that can be proven true or false." *Prof'l Sound Servs. v. Guzzi*, 349 F. Supp. 2d 722, 728 (S.D.N.Y. 2004) (citing *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995)). Conte has, therefore, failed to show that any deceptive statements actionable under the Lanham Act were made about him or his Company.

Second, even assuming *arguendo* that there were evidence in the record to support Conte's allegation that Newsday employee/agents made deceptive statements about him or his Company, no rational juror could conclude that such deceptive

18

statements were made as part of an "organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc.*, 314 F.3d at 57. Conte claims that, "[i]n terms of how widespread these false and deceptive statements made by these Newsday agents were, 50 route distributors who were told these false and deceptive criminal accusation [sic] represented two thirds of the total number of I Media route distributors at the time." (Pl.'s Newsday Opp'n ¶ 33.) However, Conte misstates the relevant market for purposes of the Lanham Act analysis. The relevant market is not I Media's route distributors at the time, but rather all route distributors at the time (I Media's current *and* potential route distributors). The actual, relevant market is therefore much larger than the one Conte describes, meaning that the proportion of the market that allegedly received the deceptive statements, assuming any such statements were made, was much smaller than Conte suggests. Moreover, for the same reasons that Conte has failed to prove that any deceptive statements were made, he has failed to show that the amount of any such statements disseminated was numerous.

Given the lack of evidence regarding the alleged deceptive statements made and their number, as well as the size of the relevant market, no rational juror could conclude that there was widespread dissemination by the Newsday defendants of any disparaging statements about plaintiff or his business. *See, e.g., Fashion Boutique of Short Hills, Inc.*, 314 F.3d at 58 (deeming twenty-seven oral statements made regarding plaintiff's products in a marketplace of thousands of customers insufficient to satisfy requirement that representations be disseminated widely); *Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1004-05 (10th Cir. 2002) (finding evidence of dissemination of information to two

customers, where plaintiff made up to 150 bids per year, insufficient to constitute "commercial advertising or promotion"); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 250 (S.D.N.Y. 2004) (holding that in making false representations to investigators about plaintiffs, defendants were not engaging in widespread dissemination or an organized campaign under the Lanham Act); *cf. Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996) (finding evidence of dissemination sufficient where statements were made to eleven out of seventy-four potential customers). Accordingly, the uncontroverted evidence shows that, even assuming *arguendo* there is merit to Conte's allegation that deceptive statements actionable under the Lanham Act were made about him or his Company, any such statements cannot be considered "commercial advertising or promotion" under the Lanham Act and, as such, Conte's deceptive advertising claim does not survive summary judgment.[16]

### 3. Plaintiff's Lanham Act Trade Dress Infringement Claim

Conte's final Lanham Act claim, alleged against both Newsday and the Consumer defendants, is for "reverse palming off." As set forth below, this claim cannot survive summary judgment.

"Reverse palming off" under the Lanham Act occurs when "A sells B's

---

[16] Because no rational juror could conclude that any deceptive statements made about plaintiff or his Company were disseminated as part of an "organized campaign to penetrate the relevant market," *Fashion Boutique of Short Hills, Inc.*, 314 F.3d at 57, the Court need not reach the question of whether the Newsday defendants could in fact be held liable for the acts of their alleged employee/agents – the route distributors who also worked for plaintiff.

product under A's name." *Societe des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 131(2d Cir. 2004) (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994)) (internal quotation marks omitted). To succeed on a claim for "reverse palming off," a plaintiff must prove "(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." *Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995).

Here, Conte claims that the Consumer defendants "directed and agreed with Newsday to copy the distinctive style and trade dress of the plaintiff's publication TV Time Magazine" for Newsday's TV Picks publication, "thus creating the false impression and confusion among readers and advertisers that TV Time Magazine was a Newsday product and that I Media and TV Time were associated or in fact part of Newsday." (Third Am. Compl. ¶ 125.) However, Conte's "reverse palming off" claim must fail because he cannot prove a primary and essential element of his trade dress infringement claim – namely, that his product's trade dress is protectable under the Lanham Act.[17]

To prevail on a trade dress infringement claim under Section 43(a), a plaintiff must demonstrate that (1) the trade dress is distinctive as to the source of the good, and (2) purchasers are likely to confuse the imitating goods with the originals. *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 617-19 (2d Cir. 2008). Thus, a plaintiff alleging trade dress infringement must first prove that his trade dress is distinctive enough to hold federal protection. Trade dresses classified as either "suggestive" or "arbitrary or fanciful" are considered to be inherently distinctive, and therefore always satisfy this first prong of an infringement claim. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31-32 (2d Cir. 1995). If a trade dress is "descriptive," however, a plaintiff must show that it has acquired a secondary meaning to receive protection. *Id.* at 32. Finally, "[g]eneric dresses – those that refer to the genus of which the particular product is a species – are never protectable." *Id.* (citation and internal quotation marks omitted).

Both Newsday and the Consumer defendants argue that Conte's trade dress is not distinctive and the Court agrees. Conte alleges that his trade dress consists of the following: (1) a "gloss paper cover," (2) "fonts and font sizes . . . in the title header," and (3) the "design, shape, lettering font and font sizes, and tri-color three part layout and appearance of the . . . advertising footer." (Third Am. Compl. ¶ 126.) In cases like this one, where there are multiple elements of a product's trade dress, "it is the combination of elements that should be the focus of the distinctiveness inquiry." *Jeffrey Milstein, Inc.*, 58 F.3d at 32 ("Thus, if the overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of generic elements."). "Nonetheless, the fact that a trade dress is composed exclusively of commonly used or functional elements

---

[17] Section 43(a) of the Lanham Act not only protects a product's trademark, but also extends protection to a product's "trade dress." The Second Circuit has defined "trade dress" as "the total image of a good as defined by its overall composition and design, including size, shape, color, texture, and graphics." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991). Here, plaintiff's claim is predicated on the alleged "reverse palming off" of his product's trade dress.

might suggest that the dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea." *Id.* The Court, therefore, first analyzes each of the elements that form Conte's overall TV Time trade dress.

The first element of Conte's trade dress, the "glossy paper cover," is not unique, as glossy paper covers are common in the magazine industry. (*See, e.g.*, Defs.' 56.1 ¶ 68 (explaining that the New York Times and the Daily News distributed television-related publications with glossy covers at the time plaintiff began to circulate his publication).) Second, the fonts (Arial Black, Arial Bold MS, Helvetica Bold, Impact, and Times New Roman (*see* Salzman Decl. Ex. I, Pl.'s Resp. to Interrogs., at 6)) and font sizes in the header are not unique. The fonts "are not unique because . . . [they] are available 'off the shelf,'" and plaintiff has not produced any evidence to dispute that fact. *Sports Traveler v. Advance Magazine Publishers, Inc.*, 25 F. Supp. 2d 154, 162 (S.D.N.Y. 1998). The font sizes are not unique because using a large, easily visible typeface is almost unavoidable for magazines. *See Chelo Publ'g v. Focus Publ'g*, 94 Civ. 0123 (CSH), 1994 U.S. Dist. LEXIS 10257, at *7-8 (S.D.N.Y. July 28, 2004). Conte's third enumerated feature of his trade dress, his advertising footer, is similarly not protectable. The advertising footer is functional, and therefore not protectable, because it "affects the cost or quality" of the product, that is, "exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1006 (2d Cir. 1995). In sum, Conte's trade dress is comprised of commonly used, non-unique, and functional elements.

Conte argues "it is not the individual attributes of any of the items contained in the cover of the plaintiff's magazine but the combined look of these items that make it distinctive." (Pl.'s Newsday Opp'n ¶ 46.) Although trade dress may in fact protect the overall look of a product, in this case, nothing in the record indicates what unique combination of otherwise commonly used and/or functional features makes Conte's trade dress inherently distinctive, *i.e.*, "likely to be perceived by customers as bearing the stamp of their maker." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381-82 (2d Cir. 1997) (explaining that laudatory, non-exact descriptions fail to indicate what unique combination of elements makes a trade dress inherently distinctive, for "[i]f the law protected style at such a level of abstraction, Braque might have prevented Picasso from selling cubist paintings in the United States"). Indeed, Conte's papers are laden with conclusory allegations that Newsday and the Consumer defendants copied and plagiarized his trade dress, but he has failed to show that the elements of his trade dress, as combined, make up a "distinct and arbitrary total visual image to consumers." *Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F. Supp. 2d 60, 71 (S.D.N.Y. 2003); *see also Landscape Forms, Inc.*, 113 F.3d at 381 ("[F]ocus on the overall look of a product does not permit a plaintiff to dispense with . . . a precise expression of the character and scope of the claimed dress . . . ."); *Medisim Ltd. v. BestMed LLC*, 10 Civ. 2463 (SAS), 2012 U.S. Dist. LEXIS 169042, at *40 (S.D.N.Y. Nov. 28, 2012) (explaining that "the fundamental test of distinctiveness is whether a trade dress serves to identify its particular source" and finding that plaintiff's "packaging does not identify [plaintiff] as the source" of the product).

21

Moreover, the Second Circuit has explained that the "level of generality at which a trade dress is described, as well as the fact that a similar trade dress is already being used by manufacturers of other kinds of products, may indicate that that dress is no more than a concept or idea." *Jeffrey Milstein, Inc.*, 58 F.3d at 33. In this case, Conte is effectively seeking protection for an unprotectable idea or concept – a glossy cover of an ad-supported magazine. *See id.* (finding plaintiff's trade dress to be unprotectable because plaintiff was "effectively seeking protection for an idea or concept – die-cut photographic greeting cards"). A trade dress described as consisting solely of glossy covers of ad-supported magazines would "simply 'refer to the genus of which the particular product is a species,'" and therefore cannot be protected under the Lanham Act. *Id.* (quoting *Two Pesos v. Taco Cabana*, 505 U.S. 763, 768 (1992)). That Conte seeks trade dress protection only in the television magazine industry does not alter the calculus. *Id.* ("Just as the first company to depict a heart and an arrow on Valentine's cards . . . could not seek protection for [that] design[] because [it is a] concept[], defined abstractly, so [plaintiff] cannot obtain protection for its general idea of creating cards out of die-cut photographs."); *see also Landscape Forms, Inc.*, 113 F.3d at 379 ("[T]he Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets.") Thus, because plaintiff's trade dress is composed exclusively of commonly used, non-unique, and functional elements, and because plaintiff's trade dress is effectively an unprotectable idea or concept, it can be considered "generic" and, therefore, not protectable under federal law.

Because the features of Conte's trade dress for which he "seeks protection can be

considered 'generic,' even a showing of secondary meaning could not make that dress 'distinctive.'" *Jeffrey Milstein, Inc.*, 58 F.3d at 34. However, in an abundance of caution, the court has considered the secondary meaning issue. "The trade dress of a product attains secondary meaning when the purchasing public 'associates' its design with a single producer or source rather than simply with the product itself." *Coach Leatherware Co.*, 933 F.2d at 168. A plaintiff need not establish that all consumers relate the product to its producer, but that a "substantial segment of the relevant consumer group makes this connection." *Id.* "Proof of secondary meaning entails vigorous evidentiary requirements," and a plaintiff bears a heavy burden to prove that its trade dress has acquired secondary meaning. *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985) (citation and internal quotation marks omitted). Six factors are considered in determining whether a plaintiff's trade dress has acquired secondary meaning: "'(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use.'" *Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir. 1995) (quoting *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987)).

Here, Conte fails to advance evidence sufficient to create a genuine issue of material fact with respect to any of the six factors. There is no evidence of advertising expenditures (there is no indication that he advertised TV Time on the radio or television and he has produced no evidence of any print advertising expenditures), consumer studies (*see* Defs.' 56.1 ¶ 79

22

(noting that plaintiff has not conducted any consumer studies)), or unsolicited media coverage of his product in 2004 or early 2005 (when he alleges Newsday copied his trade dress). Conte also did not have any sales success, as he did not sell any advertising in 2004 or early 2005 and he did not offer his magazine for sale (he distributed it for free). Additionally, Conte's use of his trade dress for the less than six months that TV Time was published does not qualify as a significant, exclusive period of time. *See Sports Traveler*, 25 F. Supp. 2d at 166 (finding nine months to be "too limited in duration and quantity to find that secondary meaning had attached"). Lastly, as discussed *supra*, Conte's papers are laden with mere conclusory allegations that Newsday and the Consumer defendants plagiarized his trade dress. However, "speculative assertions" of copying do not create secondary meaning, *see id.* at 165-66, and even if Conte had evidence to support his allegations, which he does not, "[p]roof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent," *Kaufman & Fisher Wish Co. v. F.A.O. Schwarz*, 01 Civ. 0301 (GEL), 2001 U.S. Dist. LEXIS 17064, at *19 (S.D.N.Y. Oct. 22, 2001) (citing *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1042 (2d Cir. 1992)).[18] Thus, because the uncontroverted evidence indicates that none of the six factors used to determine whether trade dress has acquired a secondary meaning weighs in favor of protecting his Conte's trade dress, no rational juror could conclude that Conte's trade dress is worthy

of protection under federal law, even if it were deemed "descriptive" rather than "generic."

Even assuming *arguendo* that Conte's trade dress was protectable under the Lanham Act, there is no evidence of consumer confusion. "The likelihood-of-confusion inquiry turns on whether numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance into the marketplace of defendant's mark." *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004) (citation and internal quotation marks omitted). There must be a "'probability' of confusion, not a mere possibility.'" *Id.* (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001)).

The Second Circuit has set forth eight factors for courts to consider in determining whether there is a likelihood of confusion: (1) the strength of the plaintiff's mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that plaintiff will bridge the gap between the products; (5) actual consumer confusion; (6) defendant's intent or any bad faith in adopting its dress; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumers. *Id.* at 162 (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)). No single factor is determinative; instead, a court "should focus on the ultimate question of whether consumers are likely to be confused." *Id.* (citation and quotation marks omitted). "Accordingly, in an appropriate case, the 'similarity of the marks' factor can be dispositive and will warrant summary judgment for an infringement defendant 'if the court is satisfied that the . . . marks are

---

[18] As to the Consumer defendants, plaintiff claims that they directed Newsday to copy plaintiff's trade dress. However, plaintiff has no evidence to support this allegation, (*see supra* nn.7-9), and, even if he did, evidence of the Consumer defendants intentional copying of TV Time's trade dress would not create secondary meaning.

Case 2:06-cv-04859-JFB-ETB   Document 507   Filed 03/13/13   Page 24 of 26 PageID #: 6813

so dissimilar that no question of fact is presented." *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (quoting *Res. Developers, Inc. v. Statute of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991)).

This is one of those cases where the "similarity of the marks" factor is dispositive in defendants' favor. The "similarity of the marks" factor takes into account the "general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember," such as "the products' sizes, logos, typefaces, and package designs." *W.W.W. Pharm. Co. v. Gillete Co.*, 984 F.2d 567, 573 (2d. Cir. 1993). Although both Conte's and Newsday's trade dress are composed of similar fonts, font sizes, glossy material, and advertising banners, several factors distinguish them. First, the titles of the magazines, "TV Time" and "TV Picks," are at best marginally similar because of the common use of "TV." *See Nabisco, Inc.*, 220 F.3d at 46. Moreover, Newsday prominently identifies "TV Picks" as a member of the Newsday family of products (by placing "Newsday" on the cover directly above the title), a brand that is undisputedly widely recognized by the relevant, consuming public, thereby dispelling any likelihood of confusion. *See id.* ("[Defendant's] prominent use of its well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products.")*; see also W.W.W. Pharm. Co.*, 984 F.2d at 573 ("[W]hen a similar mark is used in conjunction with a company name, the likelihood of confusion may be lessened."). Second, a "combination of other aspects of the commercial presentation of the parties' respective" dress also negates any source-confusion. *Nabisco, Inc.*, 220 F.3d at 47. For

example, when Newsday started printing TV Picks with a glossy cover, it reduced the magazine's size to 8" x 10". TV Time, on the other hand, measured 8.25" x 10.75" during that time period. (Defs.' 56.1 ¶ 75.) Additionally, TV Picks used the date format "The Week of . . .", whereas TV Time used a date range format (*id.* ¶ 74), and TV Picks' title was overlaid on top of the cover photograph, whereas TV Times' title was printed on a solid color banner (*id*). Third, the products are distributed in different manners: TV Picks as part of the Newsday newspaper and TV Time as a stand-alone magazine. The cumulative effect of these differences in the parties' commercial presentation of their trade dress creates distinct marketplace impressions, thereby eliminating any likelihood of consumer confusion.

In sum, whether Conte's trade dress is deemed generic or distinctive, the uncontroverted evidence shows that he cannot maintain a claim for trade dress infringement under the Lanham Act and, accordingly, summary judgment is granted in both Newsday's and the Consumer defendants' favor.

### B. Plaintiff's State Law Claims and the Consumer Defendants' Cross-Claim

The Newsday defendants and the Consumer defendants also move for summary judgment on plaintiff's remaining state law claims – the libel and tortious interference with contract claims alleged against the Newsday defendants and the fraud claim brought against the Consumer defendants.

Having determined, as discussed *supra*, that plaintiff's federal claims do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law

24

claims is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, 06-CV-6497T, 2007 U.S. Dist. LEXIS 41834, at *15 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608 (WK), 2002 U.S. Dist. LEXIS 12842, at *11-12 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction against the Newsday defendants and the Consumer defendants over plaintiff's remaining state law claims given the absence of any federal claims that survive summary judgment,[19] and dismisses such state claims without prejudice.

Similarly, given the absence of any federal claims that survive summary judgment, the Court dismisses the Consumer defendants' cross-claim for indemnity and/or contribution without prejudice.

IV. CONCLUSION

For the foregoing reasons, the Court grants the Newsday defendants' motion for summary judgment and the Consumer defendants' motion for summary judgment with respect to plaintiff's Lanham Act claims. The Court declines to exercise supplemental authority over plaintiff's remaining state law claims – the libel and tortious interference with contract claims alleged against the Newsday defendants and the fraud claim brought against the Consumer defendants – and the Consumer defendants' state law cross-claim and dismisses those claims without prejudice. The Clerk of the Court shall close the case and enter judgment accordingly.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 13, 2013
       Central Islip, NY

---

[19] All of plaintiff's other federal claims not addressed in this opinion were dismissed at the motion to dismiss stage.

* * *

Plaintiff Anthony Conte is *pro se*. The Newsday Defendants are represented by Andrew G. Celli, Jr., Esq., O. Andrew F. Wilson, Esq., and Kennisha Anlee Austin, Esq., of Emery Celli Brinckerhoff & Abady LLP, 75 Rockefeller Plaza, 20th Floor, New York, New York 10019. The CWC Defendants are represented by Sanford Strenger, Esq., of Salamon, Gruber, Blaymore & Strenger, P.C., 97 Powerhouse Road, Suite 102, Roslyn Heights, NY 11577. The Route Distributor Defendants and the Giaimo Defendants are represented by Joseph O. Giaimo, Esq., and Jade L. Fuller, Esq., of Giaimo & Vreeburg LLP, 80-02 Kew Gardens Road, Kew Gardens, NY 11415. Defendant Smith is represented by Paul Shechtman, Esq., and Daniel Victor Shapiro, Esq., of Stillman, Friedman & Shechtman, P.C., 425 Park Ave, New York, NY 10022. Defendants Sam Martinez and Dennis Springer are *pro se.*